[916 NYS2d 28]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SALEEM KHAN, Appellant.

First Department, January 20, 2011

### APPEARANCES OF COUNSEL

*Roger J. Bernstein*, New York City (*Roger J. Bernstein* and *Eugene A. Gaer* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Timothy C. Stone* and *Grace Vee* of counsel), for respondent.

### OPINION OF THE COURT

ACOSTA, J.

This case stems from a joint investigation by the New York City Police Department and the Human Resources Administration (HRA) of a pharmacy in Manhattan based on a tip that drugs were being sold out of that location without prescriptions. The investigation resulted in the prosecution of defendant for, among other crimes, health care fraud pursuant to Penal Law article 177, which was enacted in 2006 to deal specifically with fraud by health care providers.[1] This is the first case on appeal

---

1. Although article 177 applies to conduct which was already covered by other Penal Law articles, such as larceny (Penal Law art 155) and insurance fraud (Penal Law art 176), the Legislature's "stated rationale" for the health care fraud statutes was to

under that statute and we therefore write to address the nature of proof required for a conviction.

## Background

On November 15, 2007, undercover detective Pedro Gomez entered the NYC Pharmacy and asked the clerk, Marvin Portillo, for 40 pills each of the prescription medications Amitriptyline (an antidepressant) and Clonidine (use for treating high blood pressure and for detoxing from, among other things, alcohol and methadone).[2] Portillo said that was too many pills to dispense without a prescription, and he would have to ask his "boss." Portillo went to the back of the pharmacy and spoke to defendant. Although defendant told Gomez that it was a federal crime to sell those pills without a prescription, and that he could lose his job if he did so, he eventually agreed to sell Gomez the Amitriptyline and Clonidine. Portillo gave the detective two orange bottles containing pills from the back of the pharmacy, and the detective gave him two $20 bills. At the precinct, Gomez vouchered the pills: one bottle contained 40 pink pills stamped "2105V" and the other contained 41 pills stamped "129." Gomez had no relevant experience with any pharmaceutical terms and was therefore unqualified to offer an opinion identifying the pills. The pills were not subjected to laboratory analysis to determine their chemical composition.

On November 21, 2007, Detective Gomez returned to NYC Pharmacy, and asked Portillo for 20 more pills each of Amitriptyline and Clonidine. Defendant gave Gomez two small yellow envelopes, and Gomez paid with two $20 bills. Gomez vouchered 25 pink pills stamped "2105V" and 25 orange pills stamped "129," which the People assert matched the known colors and imprints for Amitriptyline and Clonidine, respectively, although they concede on appeal that no evidence was introduced at trial on this issue.

Detective Gomez made his next purchase on February 1, 2008, when he again asked Portillo for 20 pills each of Amitriptyline

---

"get at the specific conduct by health care providers who defraud the system; make it easier to aggregate claims for fraud against a single health plan; and send a clear message to health care providers that the state remains vigilant and will punish fraud against the health care system. Legislative Memorandum." (Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 177.00, at 481-482.)

**2.** Although we state what the medications are primarily used for, this information was not elicited at trial other than when Gomez testified that Advair is an asthma medication.

and Clonidine. Initially, Portillo refused to sell the medications without a prescription, explaining that the police had recently questioned him and his boss (meaning defendant). Portillo spoke to defendant, who then asked Gomez some questions, commenting, "You could be a cop. There's a lot of cops out there." Gomez gave defendant two $20 bills; defendant went to the back of the pharmacy, and a few minutes later gave Gomez a small orange bottle of pills. These pills were not introduced into evidence.

In the second phase of their investigation, Gomez presented prescriptions to defendant and asked for medications not specified in the prescriptions. To pay for the medications, Gomez used a New York State Medicaid benefits card (prepared by HRA to be used in this investigation) in the name of Ivonne Arroyo, a fictitious woman, whom Gomez said was his wife. According to Gomez, when a Medicaid recipient presents a prescription to a participating pharmacy, the pharmacy dispenses the medication and then bills Medicaid for reimbursement.

On February 28, 2008, Gomez presented defendant with a Zyprexa prescription (an antipsychotic drug), stating that it was for his girlfriend/wife.[3] He also told defendant that "[t]hey gave [his wife] this because she's crazy," adding, "I don't want that, my wife is not crazy." Rather, he wanted Amitriptyline and Clonidine like he had gotten in the past. He told Portillo earlier that he wanted the pills so that he could make money.

Defendant took the prescription to the back of the pharmacy, then returned and had Gomez sign a book on the counter and the back of the Zyprexa prescription. Gomez signed the name "Ivonne Arroyo." Defendant told Gomez that he could give him 30 pills, but Gomez asked for 40 pills of Amitriptyline and Clonidine, urging, "Come on I need to make a little money." After more negotiation, defendant agreed to give Gomez 40 pills. Defendant told Gomez to "go to no one else in the future with this kind of thing," instructing Gomez to come directly to him. Gomez asked defendant for his Medicaid card before he left. Afterward, at the precinct, Gomez vouchered 40 orange pills stamped "129." Although the pills were entered into evidence, they too were not subjected to laboratory analysis.

On March 6, 2008, Gomez went directly to defendant, bypassing Portillo, and presented a prescription for 30 pills of 600-

---

**3.** There was some confusion as to whether the name on the prescription was Gomez's girlfriend or wife, and Gomez cleared up the situation by stating "[n]o; no; no; she's not really my wife; okay. You know the deal."

milligram Sustiva (an anti-retroviral medication used for treating HIV). Gomez told defendant that he did not want the medication on the prescription, but wanted the usual pills he had previously gotten from defendant. Defendant took the prescription in the back and returned with an orange bottle labeled "Sustiva - 600 milligrams." Despite the label, according to Gomez, the bottle contained "40 orange pills stamped as GG 461, which is the Amitriptyline that I was getting in the past." According to the People, however, the orange pills he had received previously were stamped "129" not "GG 461." These pills were not introduced into evidence nor subjected to laboratory analysis.

On April 2, 2008, Gomez returned to the pharmacy and gave defendant prescriptions for three medications: Epzicom, Prezista (both of which are anti-retroviral medications) and Advair, which he said he had gotten from his "girl." Gomez also asked for Percocet, a painkiller, for his cousin, who had been hurt in a motorcycle accident. Defendant replied that he could not give Gomez anything with codeine or any other controlled substance, but could dispense anything else, including "very very strong" painkillers worth $5 to $10 per pill.

In response to defendant's request for photo identification, Gomez said he did not have any on him, and complained about being hassled despite their past dealings. Defendant explained that detectives might ask about who provided the prescriptions. Defendant asked Gomez what he wanted, and he requested "40 of my pills" plus two kinds of painkillers. Gomez signed the prescriptions, reassuring defendant that he was familiar with Arroyo's signature and would sign the way he had before. Defendant went to the back of the pharmacy, but returned and explained that he could not dispense the painkillers because they were not registered in the computer. Defendant reminded Gomez to bring identification the next time, said he would gave him the 40 pills, and told him to return on Saturday for the painkillers. Gomez asked for his Medicaid card and defendant replied, "Alright," and returned a few seconds later with the card. At the precinct, Gomez vouchered the 40 round pink pills stamped "2105V." These pills were entered into evidence, but like the others, were never subjected to laboratory analysis.

On May 21, 2008, Detective Gomez made his final purchase from defendant. Gomez returned to the pharmacy with two prescriptions; he also asked for Amitriptyline, Clonidine and Percocet. Defendant went to the back of the pharmacy, but came

back and advised Gomez that the prescriptions were "not properly registered in the computer" and that the prescription had to be "in the computer by the doctor in order to be dispensed," otherwise he could not bill Medicaid for the prescriptions. Gomez reminded defendant that he had promised Gomez strong painkillers, and asked for Amitriptyline and Clonidine instead. After some "back and forth," defendant agreed, and also asked Gomez if he wanted to purchase additional Clonidine. Gomez said yes, and defendant sold him a total of 60 pills for $20. At the precinct, he vouchered 60 round pink pills stamped "2105V."

Two months later, on July 21, 2008, the police arrested defendant and Portillo inside the pharmacy. The police recovered five prescriptions for Ivonne Arroyo that defendant had accepted from Gomez in exchange for the pink and orange pills at the pharmacy. Records showed that four of the five billings transpired almost simultaneously with defendant's receipt of the corresponding prescriptions. No such record exists for the March 6, 2008 purchase. The police also recovered a check from Medicaid made out to NYC Pharmacy in the amount of $32,297.60. It was dated April 7, 2008—five days after the April 2 exchange in which defendant received three prescriptions. Significantly, the remittance number on the check matched the remittance number in Medicaid's database for the three corresponding claims made on April 2.

Levon Aharonyan, supervising investigator at the New York Office of the Inspector General, testified, based on a document with information on Medicaid's electronic database (EMED), that on February 28, 2008 at 6:42 P.M., Medicaid was billed $706.55 for 20-milligram tablets of Zyprexa, on behalf of NYC Pharmacy for medicine dispensed to Ivonne Arroyo. On March 6, 2008, Medicaid was billed $519.04 on behalf of NYC Pharmacy for 600-milligram tablets of Sustiva dispensed to Ivonne Arroyo. Finally, on April 2, 2008, three times between 5:29 P.M. and 5:34 P.M., Medicaid was billed on behalf of NYC Pharmacy for medications dispensed to Ivonne Arroyo: $884.28 for 300-milligram tablets of Prezista; $812.89 for Epzicom tablets; and $150.71 for an Advair Diskus. All five claims were marked paid in EMED, meaning that the claims had been submitted for payment and approved, and payment made. Aharonyan, however, acknowledged that a claim could be marked as paid but payment could be withheld.

Defendant was charged with, among other offenses, grand larceny in the third degree (Penal Law § 155.35), criminal diver-

sion of prescription medications in the second degree (Penal Law § 178.20), and health care fraud in the fourth degree (Penal Law § 177.10), encompassing the transactions that occurred on February 28, March 6 and April 2, 2008. He was also charged with four counts of criminal diversion of prescription medications in the fourth degree (Penal Law § 178.10) (for transactions that occurred on November 15, 2007, November 21, 2007, February 1, 2008, and May 21, 2008), as well as various lesser included offenses. He was convicted of grand larceny in the third degree (count one), criminal diversion of prescription medications in the fourth degree (a lesser included offense of count two), health care fraud in the fourth degree (count three), and the four counts of criminal diversion of prescription medications in the fourth degree (counts four to seven).

On defendant's CPL 290.10 motion, the court dismissed the five counts of fourth-degree criminal diversion of prescription medications, and otherwise denied the motion (24 Misc 3d 1231[A], 2009 NY Slip Op 51685[U]). For the reasons that follow, we affirm the judgment.

## Health Care Fraud in the Fourth Degree

Health care fraud in the fourth degree is committed when, with intent to defraud a health plan, a person[4] knowingly and willfully provides materially false information or omits material information for the purpose of requesting payment from the health plan for a health care item, and as a result of such information, the person or another receives payment in an amount to which the person or another is not entitled, and the payment wrongfully received from a single health plan in the period of a year exceeds $3,000 in the aggregate (Penal Law §§ 177.05, 177.10).[5]

---

4. Penal Law § 177.00 (2) defines "person" as "any individual or entity, other than a recipient of a health care item or service under a health plan unless such recipient acts as an accessory to such an individual or entity."

5. Count 3 of the indictment charged:
   "The defendant, in the County of New York, from on or about February 28, 2008 to on or about April 7, 2008, with intent to defraud a health care plan, knowingly and willfully provided false information and omitted material information for the purpose of requesting payment from a health plan for a health care item and service and, as a result of such information and omission, he or another person received payment in an amount that he or such other person were not entitled to under the circumstances, and the payment wrongfully received, from a single health plan,

■ Here, the evidence supported a conviction of health care fraud in the fourth degree on the theory that the Medicaid claims misidentified the recipient of the medications. Although I agree with the dissent that the evidence presented by the prosecution for the March 6 transaction was carelessly weak, when combined with the evidence presented for the February 28th and April 2nd transactions, the evidence as a whole was sufficient (*cf. People v Ramirez*, 33 AD3d 460, 460 [2006], *lv denied* 7 NY3d 928 [2006] ["(w)hile each link in the chain of circumstances might have an innocent explanation when viewed in isolation, the evidence, viewed as a whole, supported the conclusion that defendant was a participant in the drug conspiracy"]; *People v Coscia*, 279 AD2d 352, 352 [2001] ["(d)efendant's pattern of conduct, viewed as a whole, had no reasonable explanation other than guilt"]). Indeed, it would take a very narrow view of the evidence for a jury not to figure out that the "usual pills" were not for Arroyo, but for Gomez. For instance, on February 28, when defendant told Gomez that he could give him 30 pills, Gomez asked for 40, stating that he needed to make money. Defendant also instructed Gomez to go to no one else in the future "with this kind of thing," implying that he knew what Gomez was doing. On March 6, Gomez told defendant that he did not want what was prescribed for Arroyo, but what he had gotten in the past. Significantly, on April 2, when Gomez asked for "40 of my pills" and painkillers, defendant told Gomez that he could give him "very very strong" painkillers worth $5 to $10 each. And, during the negotiations, when Gomez was trying to convince defendant to give him painkillers with codeine, he told defendant "that's why I got my girl to get me this, hook me up with this." Gomez then stated, "Listen I've been here before, so many times already. You know [inaudible] [s]he's got the hook up you know what I am saying" to which defendant responded "[w]hatever you do, if you do it with the head on, it's ok."

Viewing the evidence in the light most favorable to the People, and giving them the benefit of every reasonable inference (*People v Robinson*, 225 AD2d 399, 400 [1996], *lv denied* 88 NY2d 884 [1996]), a rational jury could have found that defendant knew that Ivonne Arroyo was not the recipient of the medications, but rather Gomez, who wanted the drugs to sell for a profit.

in a period of not more than one year, exceeded three thousand dollars in the aggregate."

■ Defendant posits that under this theory, a customer who goes to a pharmacy to obtain medication for a spouse would be guilty of health care fraud merely because the insurance claim or Medicaid claim is made in the spouse's name. We disagree. The definition of "person" for purposes of prosecution under this statute excludes a recipient of a health care item or service unless such person was an accessory to the fraud (Penal Law § 177.00 [2]). Thus, absent evidence that a spouse under defendant's hypothetical is involved in a scheme to defraud a health plan, there would be no prosecution for health care fraud. Nor would a pharmacist who dispenses medications to someone other than the one for whom medications are prescribed commit fraud in the absence of evidence that the person picking up the medications is involved in an illegal scheme and the pharmacist is also aware of what is going on.

■ An additional element of a health care fraud prosecution is evidence that the defendant "provide[d]" the materially false information. Although the statute does not expressly specify to whom the information is provided, nor does it limit the method by which the information is provided, it must be for the purpose of requesting payment from a health plan for a health care item or service (see Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 177.00, at 482-483). According to defendant, there is no evidence that defendant was the person who actually misled Medicaid. The statute, however, does not require that the People establish that defendant personally provided the false information to Medicaid. It is enough that he relayed that information to someone for the purpose of requesting payment from a health plan. Whether the bookkeeper or a secretary actually entered the information via computer is irrelevant in prosecuting defendant.[6]

Moreover, there is strong circumstantial evidence that defendant provided false information. Indeed, the pharmacy billed Medicaid for the five prescriptions used in the February 28, March 6, and April 2, 2008 transactions. The information compiled in Medicaid's electronic database proved that, on Feb-

---

6. It should be noted in this regard that pursuant to Penal Law § 177.30, "[i]n any prosecution under this article, it shall be an affirmative defense that the defendant was a clerk, bookkeeper or other employee, other than an employee charged with the active management and control, in an executive capacity, of the affairs of the corporation, who, without personal benefit, merely executed the orders of his or her employer or of a superior employee generally authorized to direct his or her activities."

ruary 28, March 6, and April 2, 2008, New York State was billed on behalf of NYC Pharmacy for five prescription medications: 20-milligram tablets of Zyprexa, 600-milligram tablets of Sustiva, an Advair 100/50 Diskus, Epzicom tablets, and 300-milligram tablets of Prezista. These five medications were certified as being dispensed by NYC Pharmacy to "Ivonne Arroyo."

Significantly, the time line of the February 28 and April 2 billings, when compared with the corresponding time line of the undercover operation, supports the conclusion that defendant conducted the billings. For example, on February 28, 2008, the undercover detective entered NYC Pharmacy at approximately 6:30 P.M., and spent the next 17 minutes negotiating with defendant over the Zyprexa prescription. The billing of Medicaid for the Zyprexa occurred on that day at 6:42 P.M. Similarly, on April 2, 2008, the undercover operation transpired at approximately 5:35 P.M. and the billing of Medicaid for the Prezista, Epzicom, and Advair occurred that day at three separate times between 5:29 P.M. and 5:34 P.M.

In addition to the dovetailing time lines, other evidence was introduced that defendant provided the false information to Medicaid. For instance, on two different occasions, defendant explicitly told Detective Gomez that he could not dispense and accept certain medications because they were "not properly registered on the computer." Moreover, defendant himself stamped the prescriptions, had the detective sign the back of the prescriptions and the book on the pharmacy counter and directed Gomez, during the second phase of the investigation, to "go to no one else in the future with this kind of thing."

■ The offense of health care fraud in the fourth degree also requires proof of receipt of payment in an amount exceeding $3,000, whether by defendant or another. Here, the evidence established that Medicaid reimbursed NYC Pharmacy for the fraudulent claims submitted by defendant, and that the total payment exceeded $3,000 in less than one year. The five claims marked as paid in EMED—$706.55, $519.04, $150.71, $812.89 and $884.28—totaled $3,073.47, paid to NYC Pharmacy, which is a "person" under the health care fraud statute (see Penal Law § 177.00 [2]).

■ The fact that none of the drugs were subjected to laboratory analysis is of no moment with respect to this count. The relevant inquiry is whether defendant provided false information for the purpose of receiving payment and a person received a payment in excess of $3,000, not the identity of the drugs that

were dispensed. Had the indictment limited defendant's act of providing materially false information to misinforming Medicaid as to the drugs that were actually dispensed, the evidence would have been insufficient.[7] But the indictment was not so limited, and, as noted above, a rational jury could have found that the materially false information consisted of misinforming Medicaid that Ivonne Arroyo was the recipient.

## Grand Larceny in the Third Degree

■ The evidence was also legally sufficient to establish defendant's guilt of third-degree grand larceny, which required the People to prove that from February 28 to April 7, 2008, defendant wrongfully took, obtained or withheld money from New York State through its Medicaid program; that defendant intended to appropriate the money to himself or a third person; and that the money exceeded an aggregate of $3,000 (*see* Penal Law §§ 155.35, 155.05 [1]). Here, defendant wrongfully took, obtained or withheld money from New York State, by misleading Medicaid as to the actual recipient of whatever drugs were dispensed, billing Medicaid for $3,073.47, and causing New York State to reimburse the pharmacy in that amount. As a result of defendant's fraudulent claims, the pharmacy exercised "dominion and control" over money to which it was not entitled, and defendant's negotiations with the undercover detective indicated his intent to appropriate the money to the pharmacy which employed him.

---

7. Given the absence of laboratory analysis and expert testimony as to what medications were dispensed, in particular on March 6, the evidence could not sustain a fourth-degree health care fraud conviction based on a theory that defendant falsely identified the medications dispensed. To be sure, unlike the criminal diversion charges, which required proof that a prescription medication was involved (*see* Penal Law § 178.00), the exact identity of the pills may be immaterial with respect to health care fraud. Rather, in this case, it was only necessary to prove that the pink and orange pills were not the prescribed medications. Arguably, the People's proof was adequate in that regard with respect to the February 28th and April 2nd transactions. That is, based on Gomez's testimony that he had received the same pink and orange pills on three prior occasions when he asked to purchase Amitriptyline and Clonidine, it could reasonably be inferred that the pills were not the medication Zyprexa, Epzicom or Prezista, and even more obviously, the pills were not the asthma inhalant Advair. On March 6, however, Gomez received orange pills marked "GG 461," and not "129." There is no evidence, however, that orange pills marked "GG 461" were not 600-milligram Sustiva pills. Without the March 6 transaction, the aggregate amount of money defrauded from Medicaid would not have exceeded $3,000.

## Other Issues

The court correctly declined to submit attempted third-degree grand larceny as a lesser included offense, as there was no reasonable view of the evidence, viewed most favorably to defendant, that he only attempted to commit grand larceny but did not complete the crime (*see People v Scarborough*, 49 NY2d 364, 371-374 [1980]).

The court properly denied defendant's speedy trial motion. The delay during the period in question was properly excluded, since it was attributable to motion practice, including a reasonable period after a decision regarding a motion, or resulted from defense counsel's request (*see People v Jones*, 235 AD2d 297 [1997], *lv denied* 89 NY2d 1095 [1997]).

Defendant's claim that the verdict was repugnant and otherwise defective is unpreserved and we decline to review it in the interest of justice. As an alternative holding, we also reject it on the merits.

Accordingly, the judgment of the Supreme Court, New York County (James A. Yates, J., at speedy trial motion; Marcy L. Kahn, J., at jury trial and sentence), rendered July 17, 2009, convicting defendant of grand larceny in the third degree and health care fraud in the fourth degree, and sentencing him, as a second felony offender, to an aggregate term of $2^{1}/_{4}$ to $4^{1}/_{2}$ years, should be affirmed.

CATTERSON, J. (dissenting). I must respectfully dissent. In my opinion, the evidence presented as to the March 6, 2008 undercover incident is insufficient to establish that the defendant provided materially false information either as to the medication dispensed or as to the identity of the recipient of the medication. Hence, I believe the People failed to prove beyond reasonable doubt that the defendant committed fourth-degree health care fraud. For the reasons set forth below, that conviction should be reduced to health care fraud in the fifth degree, and the case remanded for resentencing.

Following a seven-month undercover investigation of the defendant Saleem Khan and his employer, NYC Pharmacy, the defendant was arrested. Subsequently, a grand jury indicted him on charges of third-degree grand larceny, fourth-degree health care fraud and second-degree criminal diversion of prescription medications, as well as four counts of fourth-degree criminal diversion of prescription medications.

At trial, testimony and evidence adduced the following relevant facts: that on three occasions during phase 1 of the

investigation in November 2007 and February 2008, an undercover detective known only as Gomez requested the prescription drugs Amitriptyline and Clonidine from the defendant at the pharmacy. Gomez requested varying amounts of the drugs in exchange for cash, but without providing a prescription on any of the three occasions.

On two occasions, in return for cash, Gomez was given two types of pills in varying amounts: pink pills stamped "2105V" and orange pills stamped "129." On the third occasion, Gomez testified to receiving a "small orange bottle of pills." On each occasion, Gomez counted and vouchered the pills.

For phase 2 of the investigation, Gomez was provided with a Medicaid benefits card in the name of a fictitious woman, Ivonne Arroyo, and supplied with prescriptions for Arroyo signed by a doctor. On the next four visits to the pharmacy, Gomez handed the defendant the prescriptions and the Medicaid card, but asked instead to be given the same two drugs he had requested during phase 1 of the investigation.

On February 28, 2008, he presented a prescription for 30 20-milligram tablets of Zyprexa (an antipsychotic drug) for Arroyo. He told the defendant that Arroyo was his wife, that his wife was prescribed Zyprexa because "she's crazy . . . they gave it to my wife and she's not crazy." Instead, Gomez asked for 40 pills each of the two drugs he had requested on his initial visits to the pharmacy. He told the defendant he had his wife's Medicaid card, and defendant asked Gomez to sign a book on the counter and the back of the prescription. Gomez signed with Arroyo's name. He was handed pills which he counted at the precinct. He testified that the 40 pills he was given looked like the orange pills stamped "129" that he had received on an earlier visit.

On March 6, 2008, Gomez returned to the pharmacy and handed the defendant a prescription for Arroyo for 30 tablets of 600-milligram Sustiva (an anti-retroviral medication for HIV). Again, he told the defendant he wanted "the usual pills." The defendant handed Gomez a brown paper bag with an orange bottle labeled Sustiva 600 milligrams. The bottle contained 40 orange pills stamped "GG461."

On April 2, 2008, Gomez brought three prescriptions for Arroyo into the pharmacy for 30 tablets of Epzicom, 120 300-milligram Prezista tablets and a 60-day supply of Advair. He asked the defendant for "40 of my pills." He also asked the defendant for some Percocet painkillers for his cousin who had been in a motorcycle accident. The defendant told him he could

not dispense Percocet because it was "not registered in the computer." Gomez signed Arroyo's name in the book on the counter and on the back of the prescriptions. The defendant handed him a bottle which contained 40 pink pills with "2105V" stamped on them.

On May 21, 2008, Gomez returned with two prescriptions. At trial, he could not recall what was ordered in the prescriptions, but he asked for the two usual drugs. The defendant told him that the prescriptions were "not properly registered in the computer" and that "the prescription has to be in the computer by the doctor in order to be dispensed," otherwise he "could not bill Medicaid for the prescriptions." However, the defendant sold him 60 pills for cash. Gomez testified that although he counted and vouchered all the pills he received on each visit to the pharmacy, he did not send any of them for laboratory analysis.

A second prosecution witness, a supervising investigator from the New York Office of the Inspector General, testified about a document from Medicaid's electronic database which showed that, on the relevant dates, the pharmacy had billed Medicaid for five Arroyo prescriptions. Medicaid had approved and made payment in a total amount of $3,073.47: that is, $706.55 for Zyprexa; $519.04 for the 600-milligram tablets of Sustiva; and for three prescriptions on April 2, 2008, the amounts of $884.28 (Prezista), $812.89 (Epzicom) and $150.71 (Advair).

At the close of trial, defendant moved for a trial order of dismissal pursuant to CPL 290.10 on the grounds that the evidence was legally insufficient as to the charges of health care fraud and grand larceny, and that the prosecution had failed to prove the nature of the pills Gomez had received. The court reserved decision until after the jury verdict. The jury convicted the defendant of third-degree grand larceny, fourth-degree health care fraud, and five counts of fourth-degree criminal diversion of prescription medications.

Subsequently, the court dismissed all five counts of fourth-degree criminal diversion of prescription medications, holding that the evidence "falls short" of proving that the pills received by Gomez were prescription medications. (24 Misc 3d 1231[A], 2009 NY Slip Op 51685[U], *10.) The court denied the defendant's motion for dismissal of the counts relating to fourth-degree health care fraud and third-degree grand larceny. The court reasoned that "[t]he entire amount of this reimbursement was wrongfully and fraudulently obtained, since no medications

were ever given to the 37-year old woman named in the five prescriptions." (*Id.* at *6.)

On appeal, the defendant asserts that the court erred because the evidence was legally insufficient to establish grand larceny or the multiple elements that are required to be proven for a conviction for health care fraud in the fourth degree pursuant to Penal Law § 177.10. Specifically, the defendant asserts that the evidence was insufficient to prove, inter alia, that he made material false statements either as to the medications dispensed or as to the recipient of the medications.

For the reasons set forth below, I agree with the defendant to the extent that the evidence was insufficient as to the incident of March 6, 2008. Consequently, the People failed to establish the $3,000 value element of the fourth-degree health care fraud charge, and consequently the value element of third-degree grand larceny.

It is well established that in determining whether a jury verdict is supported by legally sufficient evidence, this Court must decide

> "whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial . . . and as a matter of law satisfy the proof and burden requirements for every element of the crime charged." (*People v Bleakley*, 69 NY2d 490, 495 [1987] [citations omitted].)

To establish fourth-degree health care fraud, the People must prove that the defendant,

> "with intent to defraud a health plan . . . knowingly and willfully provide[d] materially false information . . . for the purpose of requesting payment from a health plan for a health care item or service and, as a result of such information . . . [the defendant] or another person receive[d] payment in an amount [to which the defendant or another was] not entitled," and "the payment wrongfully received . . . from a single health plan, in a period of not more than one year, exceed[ed] [$3,000] in the aggregate." (Penal Law §§ 177.05, 177.10.)

As a threshold matter, it is undisputed that none of the pills were sent for laboratory analysis at any time before or during

trial. Further, that error was compounded by an inept prosecution. As the trial court pointed out, even though some of the pills were introduced into evidence, the People did not proffer any expert testimony that the pills were prescription medications. Moreover, although the lead investigator testified he was familiar with the two prescription medications requested by Gomez, he was never asked to identify the pills Gomez received; Gomez was not able to identify the pills and testified to nothing more than that all the pills he received looked alike even though he described one batch of pills as stamped with different lettering than that on the pills he received on any other occasion.

The People nevertheless argue that identifying the pills given to Gomez in the second phase of the investigation is not necessary. The People argue that since the pills were plainly not the prescribed medications, the element of material misinformation as to the medications dispensed is established.

I am persuaded by the argument to the extent that the pills supplied to Gomez on April 2, 2008, where the prescription called for an asthma inhaler, were plainly not the prescribed medication. Viewing the evidence in the light most favorable to the People, I am also inclined to agree that the People presented sufficient evidence for a jury to conclude that the pink and orange pills stamped "2105V" and "129" dispensed on February 28, 2008 and April 2, 2008 were pills of the same type that Gomez bought for cash when he first requested Amitriptyline and Clonidine. Not being able to identify them precisely does not preclude the permissible inference that, nevertheless, they were the "usual pills that [he] was getting in the past" and not the drugs ordered on the prescriptions that Gomez presented to the defendant on February 28, 2008 and April 2, 2008.

Therefore, I believe the People presented ample proof that the defendant complied with Gomez's request for different medications than those set forth in the prescriptions the detective presented. Hence, there is sufficient evidence for finding that the defendant provided materially false information as to the dispensed medications on February 28 and April 2.

However, in my opinion, there is insufficient evidence for concluding that, on March 6, 2008, the defendant dispensed something other than Sustiva, the prescribed medication, or that he dispensed it knowing that Arroyo was not going to be the recipient. This was the second prescription handed to the defendant by Gomez. The first prescription was for an antipsychotic drug, and Gomez played out a scene, describing Arroyo as

his wife and that she did not need the medication because she wasn't crazy. So, Gomez had argued, the defendant could substitute his "usual pills that [he] was getting in the past."

On March 6, 2008, when Gomez came into the pharmacy, he had a prescription for an anti-retroviral medication prescribed for HIV patients. This time when Gomez again asked for "the usual pills," the defendant handed him pills stamped "GG461." Even though at trial Gomez characterized the pills as "the Amitriptyline that I was getting in the past" the pills were clearly neither those stamped "2105V" nor "129."

Thus, there is no basis for concluding that the medication handed to Gomez was not Sustiva. Indeed, the majority agrees. It states, albeit in a footnote, "There is no evidence, however, that orange pills marked 'GG 461' were not 600-milligram Sustiva pills." In my opinion, the rational inference arising from the possibility that the pills *could have been* the prescribed Sustiva is that the defendant filled the prescription for the person for whom the Sustiva was prescribed, that is, Arroyo.

Moreover, there is no evidence that the defendant suspected or knew that Arroyo did not exist. Only Gomez and the investigators knew that Arroyo was a fictitious individual. Further, based on the explanations the defendant made to Gomez as to why he could not dispense Percocet, it is evident that the pharmacy used a system where legitimate prescriptions are entered by doctors into a computer database in order that they can be billed to Medicaid. Since Arroyo's prescriptions evidently were entered in the computer, there was no basis for the defendant to believe that Arroyo was not a real patient, or that Gomez, who had never identified himself by name, or shown the defendant any identification, was not indeed her husband or boyfriend.

Consequently, the majority's position that the defendant knowingly misidentified the recipient because "[he] knew that Ivonne Arroyo was not the recipient of the medications, but rather Gomez, who wanted the drugs to sell for a profit" is not supported by the evidence as to the March 6, 2008 incident. Such conclusion requires evidence that on March 6, 2008 the defendant gave Gomez the pills he asked for instead of dispensing the prescribed medication. This, however, as the majority clearly holds, is precisely the evidence that was not proffered. Hence, the element of "knowingly and willfully provid[ing] materially false information" was not proved beyond a reasonable doubt.

Finally, in my opinion, the failure of the People to prove beyond a reasonable doubt that the defendant materially misinformed Medicaid either as to the drugs dispensed or as to the recipient of the medication on March 6, 2008 impacts the value elements of fourth-degree health care fraud and third-degree grand larceny. I would therefore vacate the larceny conviction, reduce the health care fraud conviction to fifth degree, and remand for resentencing.*

Tom, J.P., Andrias and Moskowitz, JJ., concur with Acosta, J.; Catterson, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered July 17, 2009, affirmed.

---

* The defendant was acquitted by a jury of the lesser included offense of grand larceny in the fourth degree.